U.S. DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

JUN 28 2016

FILED

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 58-JL |
| v. | ) | No. 1:16-cr-00007-PB |
| | ) | |
| FELIPE ANTONIO REYES EDUARDO | ) | |
| A/KA "WILLIAM" | ) | |

## PLEA AGREEMENT

Pursuant to Rules 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the United States of America by its attorney, Emily Gray Rice, the United States Attorney for the District of New Hampshire, and the defendant, Felipe Antonio Reyes Eduardo, and the defendant's attorney, William R. Sullivan, Jr., Esquire, enter into the following Plea Agreement:

1.  The Plea and the Offense.

The defendant agrees to plead guilty to Count Two of the Indictment charging him with Conspiracy to Distribute Controlled Substances (Fentanyl, Heroin and Cocaine Base) in violation of Title 21, United States Code, Section 846.   The defendant further agrees to the sentencing stipulations specified in section 6 of this plea agreement.   In exchange for the defendant's guilty plea, the United States agrees to the sentencing stipulations specified in section 6 of this agreement and, upon sentencing, to dismiss Count One of the Indictment charging the defendant with Distribution of a Controlled Substance (Fentanyl) in violation of Title 21, United States Code, Section 841(a)(1).

1

2.  <u>The Statute and Elements of the Offense.</u>

Count Two of the Indictment charges the defendant with Conspiracy to Distribute Controlled Substances (Fentanyl, Heroin and Cocaine Base), including 40 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl), in violation of Title 21, United States Code, Section 846.    Title 21, United States Code, Section 846, provides, in pertinent part, as follows:

> Any person who … conspires to commit [the offense of distribution of a controlled substance in violation of Title 21, United States Code, Section 841] shall be subject to the same penalties as those prescribed for the offense … which was the object of the … conspiracy.

18 U.S.C. § 846.    The crime of Conspiracy to Distribute Controlled Substances, as defined in Title 21, United States Code, Section 846, and in the context of this case, has the following elements, each of which the government would be required at trial to prove beyond a reasonable doubt:

> <u>First</u>, that the agreement specified in the indictment, and not some other agreement or agreements, existed between at least two people to distribute a controlled substance;
>
> <u>Second</u>, that the defendant willfully joined in that agreement;
>
> <u>Third</u>, that the agreement involved the distribution of a mixture weighing at least 40 grams and containing a detectable amount of fentanyl

*First Circuit Pattern Jury Instruction, Criminal Cases, Hornby, 4.21.846 (December 22, 2014) and 4.21.841B (August 27, 2015).*

2

The illegal object of the alleged conspiracy is Distribution of Controlled Substances (Fentanyl, Heroin and Cocaine Base), including 40 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl), in violation of Title 21, United States Code, Section 841(a)(1). Title 21, United States Code, Section 841(a)(1) provides in pertinent part as follows:

[I]t shall be unlawful for any person knowingly or intentionally ... to ... distribute, dispense, or possess with intent to ... distribute or dispense a controlled substance.

21 U.S.C. § 841(a)(1). The crime of Distribution of Controlled Substances (Fentanyl, Heroin and Cocaine Base), as defined in Title 21, United States Code, Section 841(a)(1), has the following essential elements:

First, that on the date alleged in the indictment, the defendant transferred a controlled substance to another;

Second, that the defendant did so knowing the substance transferred was a controlled substance; and

Third, that the defendant acted intentionally and that it was his conscious object to transfer the controlled substance to another person.

*First Circuit Pattern Jury Instructions, Criminal Cases (Hornby), Part 4.21.841(a)(1)B*

*(August 27, 2015).*

3. Offense Conduct.

The defendant stipulates and agrees that, if this case proceeded to trial, the government would prove the following facts and that those facts would establish the

3

elements of the offense of Conspiracy as defined Title 21, United States Code, Section

846, beyond a reasonable doubt:

### 1.   *December 14, 2015 (Heroin)*

*On or about December 1, 2015, the Drug Enforcement Administration and the High Intenstity Drug Trafficking Enforcement Area began an investigation of a suspected supplier of heroin known at the time only by his street name, "Blackie," but later identified as W.A.G.A.   On December 14, 2015, at the direction of investigators, a Confidential Source to whom W.A.G.A. previously had sold controlled substances called W.A.G.A. and expressed an interest in purchasing one finger of heroin and two rocks of crack cocaine.   According to the CS, W.A.G.A. agreed to sell him the heroin and crack cocaine for a total of $480 and told the CS to meet him in the area of St. Therese's Church in Methuen, Massachusetts, later that day.*

*The CS, accompanied by a DEA agent, arrived at the church at the agreed upon time. There the CS received a phone call from W.A.G.A., who – according to the CS -- stated that his runner was on his way.   The DEA agent provided the CS with $480 to complete the anticipated purchase.   A few minutes later, W.A.G.A. called the CS again and, once more according to the CS, told the CS that the runner would meet him at a nearby McDonald's restaurant instead of the church.   The CS and the DEA agent drove to the McDonald's restaurant where they both entered the restaurant.*

*When they left the restaurant, the CS gave the DEA agent a clear plastic baggie containing an off-white powder substance and a smaller plastic bag containing two small rock-like substances. Through later laboratory testing, those substances were determined to be, respectively, 9.62 grams of a mixture containing a detectable quantity of heroin and 0.468 grams of a mixture containing a detectable quantity of cocaine base or crack cocaine.   Before entering the restaurant, the CS was searched for contraband, weapons and cash and none were found other than the $480 the DEA agent had given him.   After the transaction, the CS was again searched and no contraband, weapons or cash were found.*

*Outside the restaurant, the DEA agent observed a male who the DEA agent described as a slightly built Hispanic, in his mid-twenties.   The DEA agent's description is consistent*

4

*with the defendant's appearance.   When the DEA agent was inside the McDonald's restaurant, he had noticed the same individual staring at him and acting nervously.*

*A little later in the day, after the CS and the DEA agent had returned to New Hampshire, the CS received a telephone call.   While the DEA agent could only hear the CS's end of the conversation, the CS reported that the call was from W.A.G.A. and that W.A.G.A. told him that going forward he had no objection to dealing with the DEA agent directly instead of through the CS.*

### 2.     December 16, 2015 (Heroin and Fentanyl) (2 Transactions)

*On December 16, 2015, the DEA agent called W.A.G.A. in an undercover capacity and told him that he wanted to purchase two fingers of heroin.   W.A.G.A. said that, at the time, he had only one finger, which he agreed to sell to the DEA agent.   The DEA agent then agreed to meet the same runner W.A.G.A. used on December 14, later in the day at the same McDonald's in Methuen.*

*After arriving at McDonald's at the appointed time, the DEA agent received a telephone call from W.A.G.A., who told the DEA agent that the runner was in the rest room.   The DEA agent entered the rest room and saw an individual who he recognized as the staring, nervous individual from the earlier – December 14 -- transaction at McDonalds. In the rest room, the DEA agent gave the runner $400 in exchange for a clear plastic baggie containing an off-white powder, which was determined through later laboratory testing to be 9.31 grams of a mixture containing detectable quantity of heroin.*

*The DEA agent left the premises, but before getting a half a mile, he received a call from W.A.G.A. saying that he could now supply the second finger.   The DEA agent told W.A.G.A. that he had to meet with a customer but called W.A.G.A. back later and told him that he remained interested in purchasing another finger.   W.A.G.A. texted the DEA agent Johnson an address at which he instructed the DEA agent to meet his runner to purchase the second finger.*

*After arriving at the address, the DEA agent received a call from W.A.G.A. who stated that his runner – who he identified this time by the name "William" -- would be arriving shortly, driving W.A.G.A.'s car, a silver Chrysler Pacifica.   Soon, a car matching that*

5

*description – driven by William -- arrived.   William eventually parked across the street from the DEA agent facing the opposite direction.   The DEA agent approached the car and gave William $400 in cash in exchange for nine plastic bags each containing an off-white powder, the total quantity of which was later determined through laboratory testing to be 7.716 grams of a mixture containing a detectable quantity of fentanyl.*

### 3. December 22, 2015 (Fentanyl)

*On December 22, 2015, the DEA agent called W.A.G.A. and asked him to sell the DEA agent two fingers of heroin.   During the call, the DEA agent introduced W.A.G.A. to a Drug Task Force Officer who was using the undercover name Victor.   The DEA agent explained that, unlike him, "Victor" spoke Spanish well and would be helping him deal drugs.   W.A.G.A. and the DEA agent agreed that he would send his runner to meet the DEA agent at the McDonald's in Methuen later that day.*

*After arriving at McDonald's, W.A.G.A. called the DEA agent and told him that his runner was almost there.   A short while later, the runner entered the restaurant and the task force officer and the DEA agent followed him into the rest room.   In the rest room, the DEA agent introduced the runner to the undercover task force officer.   The runner handed the DEA agent two plastic bags containing an off-white powder, and the DEA agent handed the runner $800.   The powder was later determined, through laboratory analysis, to be 19.69 of a mixture containing a detectable amount of the substance fentanyl.   The task force officer explained to the runner that he would be helping the DEA agent conduct deal drugs and that William should expect to deal directly with the task force officer in the future.*

### 4. January 6, 2016 (Heroin)

*On January 6, 2016, the DEA agent called W.A.G.A. and asked about buying three fingers of heroin.   W.A.G.A. agreed.   W.A.G.A. and the DEA agent further agreed that the DEA agent would meet the runner at the Methuen's McDonalds to complete the heroin transaction.   After the DEA agent arrived at and entered the restaurant, he observed William enter the restaurant's rest room and followed.   In the rest room, the DEA agent handed William $1200 cash, and William gave the DEA agent three baggies containing an off-white powdery substance, later determined through laboratory testing*

6

*to be 34.77 grams of a mixture containing a detectable amount of the substance heroin.*

### 5.    January 14, 2016 (Fentanyl)

*On January 14, 2016, the DEA agent contacted W.A.G.A., inquiring about the possibility of buying two fingers of heroin.   W.A.G.A. agreed to the proposed transaction and told the DEA agent to meet the runner once again at the Methuen McDonald's.   Shortly after his arrival there, the DEA agent saw William arrive and again enter the rest room.   He followed the runner, and, inside the bathroom, the runner removed from his glove four plastic bags containing similar quantities of an off-white powder, which was later determined through laboratory analysis to contain 20.12 grams of a mixture containing a detectable amount of fentanyl.   William returned two of the plastic bags to his glove where the DEA agent saw even more plastic bags containing similar quantities of the same substance.   In exchange for $800, William gave the DEA agent the two bags that he did not return to his glove.*

### 6.    January 20, 2016 (Fentanyl)

*On January 20, 2016, the DEA agent called W.A.G.A., asking to purchase three fingers of heroin. W.A.G.A. stated that he needed forty minutes.   Later W.A.G.A. called the DEA agent and told him that someone would be at the Methuen McDonalds in fifteen minutes. The DEA agent then told W.A.G.A. that "Victor" would be there to complete the purchase on the DEA Agent's behalf.   About ten minutes later, the task force officer entered the McDonalds restaurant.   W.A.G.A. then called the DEA agent and said that the runner would be there in five minutes, which the DEA agent then relayed to the task force officer.*

*About five minutes later, the task force officer saw William enter the restaurant.   The task force officer once again followed the runner into the rest room and gave him $1200 in exchange for three plastic bags containing an off-white powder, later determined through laboratory testing to contain 30.22 grams of a mixture containing a detectable amount of fentanyl.   After completing the exchange, the task force officer – i.e. "Victor" – told William that $400 per finger was becoming too expensive and that W.A.G.A. would have to lower his price.   The runner promised to discuss the price issue with W.A.G.A..*

7

Approximately fifteen minutes later, the DEA agent received a call from W.A.G.A. who said he wanted to discuss price for future deals.   W.A.G.A. asked if "Victor" was available to help translate.   The DEA agent responded no but said he would call W.A.G.A. back later with Victor on the line.   After about another fifteen minutes, the DEA agent called W.A.G.A. back with "Victor" – i.e., the task force officer -- on the line. The task force officer spoke with W.A.G.A. in Spanish.   During his conversation with the task force officer, W.A.G.A. offered to lower his prices for larger purchases:   $350 per finger for six to nine fingers and $325 per finger for ten fingers or more.   W.A.G.A. also said that he would need an hour's notice before he could fill large orders.

### 7.   *February 18, 2016 (Fentanyl)*

On February 18, 2016, the DEA agent called W.A.G.A. from his office in Bedford, New Hampshire, and recorded the call.   After greeting W.A.G.A., he handed the phone to the task for officer, who told W.A.G.A. in Spanish that he and the DEA agent wanted to purchase ten fingers of heroin later that day.   W.A.G.A. agreed and the task force officer confirmed that the price would be $300 per finger.   (In the period since January 20, W.A.G.A., the task force officer and the DEA agent had conversations in which W.A.G.A. agreed to further reduce the price of ten or more fingers of heroin to $300 per finger.) The task force officer and W.A.G.A. agreed to meet later that day in New Hampshire.   A few minutes later, after ending the call, W.A.G.A. called back and asked whether he should package the ten fingers packaged as individual fingers or one large bag.

At about 3:00 p.m., the task force officer called W.A.G.A., again recording the conversation.   Just after W.A.G.A. picked up the phone and before they greeted each other, the task force officer overheard W.A.G.A. saying, "This is going to be a good call."   The task force officer told W.A.G.A. that they could complete the ten finger deal at a McDonald's restaurant in Salem, New Hampshire, and that he would be there shortly.   W.A.G.A. agreed to the time and place of the deal.

The task force officer arrived at McDonald's at the agreed upon time.   After the task force officer waited a half an hour or so for the runner to arrive, the DEA agent called W.A.G.A. and asked where his runner was.   W.A.G.A. told the DEA agent to hold on, which he did.   When he returned to the call, W.A.G.A. told the DEA agent that the runner had gone to the wrong McDonald's but was on his way to the right one and would

*be there soon. About fifteen minutes later, the task force officer observed the runner arriving at the correct McDonald's, where he was waiting.*

*After the runner entered the restaurant, he and the task force officer Garcia made eye contact and the runner followed the task force officer into the rest room. There, the task force officer gave the runner $3000 in cash, and the runner gave the task force officer one large clear plastic bag containing a tan block-like substance and one smaller clear plastic bag also containing a tan block-like substance. Through laboratory testing, the substance was determined to be 104.69 grams of a mixture containing a detectable amount of fentanyl.*

*After the exchange was completed, the runner asked the task force officer where the DEA agent was. The task force officer told the runner that the DEA agent was not around. The runner then asked task force officer why he changed the location of the transaction to New Hampshire from their usual location at the McDonald's in Methuen. The task force officer responded that he did not want to do the transaction in Massachusetts because, in certain areas of Massachusetts, the police target cars with New Hampshire plates. The runner agreed.*

### 8. *March 23, 2016 (Fentanyl)*

*On March 23, 2016, the task force officer called W.A.G.A. and asked about purchasing 15 fingers of heroin. W.A.G.A. agreed and advised the task force officer that his runner would meet the task force officer at the same Salem, New Hampshire, McDonald's restaurant at which they met on February 18. With the DEA agent observing from outside, the task force officer waited inside. Soon, William entered the restaurant and then the restaurant's rest room. The task force officer followed him. Inside the restroom, pursuant to an arrest warrant, the runner was arrested by the task force officer and other law enforcement officers who were waiting there for the runner. A search of the runner incident to arrest yielded a large quantity of a substance that was later determined through laboratory analysis to be approximately 150 grams of a substance containing a dectectable amount of fentanyl. During booking, the runner, William, identified himself as the defendant, Felipe Antonio Reyes Eduardo.*

4.    Penalties, Special Assessment and Restitution.

The defendant understands that the penalties for the offense are:

A.    A mandatory minimum prison term of five years and a maximum prison term of forty years (21 U.S.C. § 841(b)(1)(B)(vi));

B.    A maximum fine of $5,000,000 (21 U.S.C. § 841(b)(1)(B)(vi)); and

C.    A term of supervised release of not less than four years and a maximum of life.    The defendant understands that the defendant's failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring the defendant to serve in prison all or part of the term of supervised release, with no credit for time already spent on supervised release (21 U.S.C. § 841(b)(1)(B)(vi) and 18 U.S.C. §3583).

The defendant also understands that he will be required to pay a special assessment of $100 at or before the time of sentencing; and that the Court may order him to pay restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663 or § 3663A.

5.    Sentencing and Application of the Sentencing Guidelines.

The defendant understands that the Sentencing Reform Act of 1984 applies in this case and that the Court is required to consider the United States Sentencing Guidelines as advisory guidelines.    The defendant further understands that he has no right to withdraw from this Plea Agreement if the applicable advisory guideline range or his sentence is other than he anticipated.

The defendant also understands that the United States and the United States Probation Office shall:

10

A.    Advise the Court of any additional, relevant facts that are presently known or may subsequently come to their attention;

B.    Respond to questions from the Court;

C.    Correct any inaccuracies in the pre-sentence report;

D.    Respond to any statements made by him or his counsel to a probation officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant acknowledges that any estimate of the probable sentence or the probable sentencing range under the advisory Sentencing Guidelines that he may have received from any source is only a prediction and not a promise as to the actual sentencing range under the advisory Sentencing Guidelines that the Court will adopt.

6. Sentencing Stipulations and Agreements.

Pursuant to Fed. R. Crim. 11(c)(1)(B), the government agrees to recommend the application of the "safety valve" embodied in Title 18, United States Code, Section 3553(f), and United States Sentencing Guideline, Section 5C1.2, and a sentence no lower than the middle of the sentencing guideline range as determined by the Court, after the application of any departures.   The defendant agrees to recommend a sentence no lower than the middle of the sentencing guideline range as determined by the Court, after the application of any departures.

The parties are free to make recommendations with respect to the terms of

11

imprisonment, fines, conditions of probation or supervised release, and any other penalties, requirements, and conditions of sentencing as each party may deem lawful and appropriate, unless such recommendations are inconsistent with the terms of this Plea Agreement.

      7.   Acceptance of Responsibility.

      The United States agrees that it will not oppose an appropriate reduction in the defendant's adjusted offense level, under the advisory Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the offense.   The United States, however, may oppose any adjustment for acceptance of responsibility if the defendant:

    A.     Fails to admit a complete factual basis for the plea at the time he is sentenced or at any other time;

    B.     Challenges the United States' offer of proof at any time after the plea is entered;

    C.     Denies involvement in the offense;

    D.     Gives conflicting statements about that involvement or is untruthful with the Court, the United States or the Probation Office;

    E.     Fails to give complete and accurate information about his financial status to the Probation Office;

    F.     Obstructs, or attempts to obstruct, justice prior to sentencing;

    G.     Has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

H.    Fails to appear in court as required;

I.    After signing this Plea Agreement, engages in additional criminal conduct; or

J.    Attempts to withdraw his guilty plea.

The defendant understands and agrees that he may not withdraw his guilty plea if, for any of the reasons listed above, the United States does not recommend that he receive a reduction in his sentence for acceptance of responsibility.

The defendant also understands and agrees that the Court is not required to reduce the offense level if it finds that the defendant has not accepted responsibility.

If the defendant's offense level is sixteen or greater, and he has assisted the United States in the investigation or prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently, the United States will move, at or before sentencing, to decrease the defendant's base offense level by an additional one level pursuant to U.S.S.G. § 3E1.1(b).

8.    Waiver of Trial Rights and Consequences of Plea.

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him. The defendant also understands that he has the right:

13

A.   To plead not guilty or to maintain that plea if it has already been made;

B.   To be tried by a jury and, at that trial, to the assistance of counsel;

C.   To confront and cross-examine witnesses;

D.   Not to be compelled to provide testimony that may incriminate him; and

E.   To compulsory process for the attendance of witnesses to testify in his defense.

The defendant understands and agrees that by pleading guilty he waives and gives up the foregoing rights and that upon the Court's acceptance of his guilty plea, he will not be entitled to a trial.

The defendant understands that if he pleads guilty, the Court may ask him questions about the offense, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers will be used against him in a prosecution for perjury or making false statements.

9.   Acknowledgment of Guilt; Voluntariness of Plea.

The defendant understands and acknowledges that he:

A.   Is entering into this Plea Agreement and is pleading guilty freely and voluntarily because he is guilty;

B.   Is entering into this Plea Agreement without reliance upon any promise of benefit of any kind except as set forth in this Plea Agreement;

C.   Is entering into this Plea Agreement without threats, force, intimidation, or coercion;

14

D.   Understands the nature of the offense to which he is pleading guilty, including the penalties provided by law; and

D.   Is completely satisfied with the representation and advice received from his undersigned attorney.

11.   <u>Scope of Agreement</u>.

The defendant acknowledges and understands that this Plea Agreement binds only the undersigned parties and cannot bind any other non-party federal, state or local authority.   The defendant also acknowledges that no representations have been made to him about any civil or administrative consequences that may result from his guilty plea. The defendant understands such matters are solely within the discretion of the specific non-party government agency involved.   The defendant further acknowledges that this Plea Agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant.

12.   <u>Collateral Consequences</u>.

The defendant understands that, as a consequence of his guilty plea, he will be adjudicated guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

13.   <u>Satisfaction of Federal Criminal Liability; Breach</u>.

The defendant's guilty plea, if accepted by the Court, will satisfy his federal criminal liability in the District of New Hampshire arising from his participation in the conduct that

forms the basis of the Indictment in this case.    The defendant understands that if, before

sentencing, he violates any term or condition of this Plea Agreement, engages in any

criminal activity, or fails to appear for sentencing, the United States may consider such

conduct to be a breach of the Plea Agreement and may withdraw therefrom.

    14.  <u>Waivers</u>.

        A.  Appeal.

The defendant understands that he has the right to challenge his guilty plea and/or

sentence on direct appeal.    By entering into this Plea Agreement the defendant

knowingly and voluntarily waives his right to challenge on direct appeal:

           1.  His guilty pleas and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues; and

           2.  All aspects of the sentence imposed by the Court if that sentence is any stipulated sentence or within any stipulated sentencing range specified in section 6 of this agreement.

The defendant's waiver of his rights does not operate to waive an appeal based

upon new legal principles enunciated in Supreme Court or First Circuit case law after the

date of this Plea Agreement that have retroactive effect; or on the ground of ineffective

assistance of counsel.

        B.  Collateral Review

The defendant understands that he may have the right to challenge his guilty plea

and/or sentence on collateral review, e.g., pursuant to a motion under 28 U.S.C. §§ 2241

or 2255. By entering into this Plea Agreement, the defendant knowingly and voluntarily waives his right to collaterally challenge:

1.  His guilty pleas, except as provided below, and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues; and

2.  All aspects of the sentence imposed by the Court if that sentence is stipulated to or within any stipulated sentencing range specified in section 6 of this agreement.

The defendant's waiver of his right to collateral review does not operate to waive a collateral challenge to his guilty plea on the ground that it was involuntary or unknowing, or on the ground of ineffective assistance of counsel. The defendant's waiver of his right to collateral review also does not operate to waive a collateral challenge based on new legal principles enunciated in Supreme Court or First Circuit case law decided after the date of this Plea Agreement that have retroactive effect.

C. Freedom of Information and Privacy Acts

The defendant hereby waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of the case(s) underlying this Plea Agreement, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

17

D. Appeal by the Government

Nothing in this Plea Agreement shall operate to waive the rights or obligations of the Government pursuant to pursue an appeal s authorized by law.

15.     Immigration Status.

The defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the defendant is pleading guilty.   Indeed, because of the nature of the offenses to which the defendant is pleading guilty, removal may be presumptively mandatory.   Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the Court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

16.   No Other Promises.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

18

17.  Final Binding Agreement.

None of the terms of this Plea Agreement shall be binding on the United States until this Plea Agreement is signed by the defendant and the defendant's attorney and until it is signed by the United States Attorney for the District of New Hampshire, or an Assistant United States Attorney.

18.  Agreement Provisions Not Severable.

The United States and the defendant understand and agree that if any provision of this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is null and void and no part of it may be enforced.

EMILY GRAY RICE
United States Attorney

Date:  June 28, 2016          By:  _Will E. Morse_

William E. Morse
Assistant U.S. Attorney
Bar # 421934 (D.C.)
53 Pleasant St., 4th Floor
Concord, NH   03301

The defendant, Felipe Antonio Reyes Eduardo, certifies that he has read this 20-page Plea Agreement and that he fully understands and accepts its terms.

Date:  June 28, 2016          _[signature]_

Felipe Antonio Reyes Eduardo
Defendant

19

I have read and explained this 20-page Plea Agreement to the defendant, and he has advised me that he understands and accepts its terms.

Date:  June 2<u>8</u>, 2016

       William R. Sullivan, Jr., Esquire
       Attorney for Felipe Antonio Reyes
            Eduardo